People versus Odell Calvin, a.k.a. Julius Jones, 21-0989. Before you, you have Justice Aurelia Paczynski, Justice Terry Lavin, and myself, Justice Smith. Our procedure is as follows. Basically, we let you go on for 10 to 15 minutes. And at the end of that, then we ask questions. We try not to interrupt you to give you your best opportunity. And then the appellee does the same. And then there's the closing. So with that in mind, you may proceed. Good afternoon, Your Honor. Justice Smith, Justice Paczynski, and Justice Lavin, my name is Andrea Lyon. And together with Kate Cohn, who's observing, I represent Julius Jones, who's also known as Odell Calvin. As I understood it, I should prepare approximately 10 minutes. I'd like to reserve five minutes for rebuttal if that's OK. Just realize when we look at your brief, it looks like it's going to go on forever. So be choosy. I am aware, Your Honor. I was just explaining to my client that we can't argue the whole brief unless you have like a whole day. So since I know you don't. There are plenty of issues laid out there. In fairness, we normally ask attorneys to start with their best argument because we've read the briefs. We've read the record. We've read the cases. So we're very familiar with all of that. So just start with your high points and work your way down from that. It was my intention, Justice Paczynski, to argue issue five about the jury instruction. And if there's time, I'd like to also argue the first issue, which is the prosecutorial misconduct and opening and closing. And it's I mean, no disrespect to any of my other issues, but I'm aware that time is limited. And so I'd like to start by and I'm presuming I do not need to tell you what the facts are here. But if you have any questions about them, please feel free to ask. I'm going to not recite them for you because like that would be boring and who wants to. I always wish there was an objection. Boring, you know, during trial. It isn't boring. It's just that we are very familiar with it. So you don't need to repeat it. OK, so the in their case, the state attempted to bolster the identification through the testimony of Officer Muris. I'm not sure if I'm pronouncing her name correctly, who saw a video that in a building that purported to show the car that was stolen and a person near it who she was not allowed to identify, but to simply describe at trial. There were pre-trial motions about this, and that ruling was by Judge Coughlin, who was on the case prior to Judge Raines being on the case. And Judge Coughlin stated that, you know, that the witness would not be allowed to make an identification, but did not rule, reserved ruling, on whether the negative inference instruction would be given or not. And took that proffered instruction under advisement. And so this is the heart of this argument. The question isn't, as you know, my esteemed opponent says, is whether or not the police chose to destroy this, but whether the police, once aware of it, did what they could to preserve it. And when it was not easily transferred onto a USB drive of some kind, Officer Muris didn't do the obvious. I mean, we all have these. There's no reason why, at the minimum, she couldn't have taken a picture of what she saw there and then informed the detective. She did inform the detective. The detective did nothing to try to get to this information. And by the time the defense knew about it, it had long since been destroyed. And it's really important, I think, that the jury was told that that lack of evidence was something that they could hold against the prosecution by the judge. It's not enough just for the defense to argue it. I have noticed, as a defense lawyer, that people pay a lot more attention to the judge than they do to defense lawyers or prosecutors, for that matter. And they need to know that as a legal matter, that is something they can consider. And after the close of the state's case, the defense did submit such a pattern instruction. And the judge refused to give it and saying that the sanction, the sanction that the previous judge, Judge Coughlin, had granted was no identification, which was a discovery sanction, not a ruling on whether or not there should be an instruction. When defense counsel pointed out that, in fact, that had been reserved, the judge held my ruling with stand. That's how it reads in the record. So I'm just quoting it there. A jury instruction is appropriate when a party has a lost available evidence that they had stated destroyed or lost evidence. They might, if they choose to, infer that a true fact is against the state interest. And as I'm hardly breaking new ground here when I say that there is no question that if there is some evidence to justify giving a jury instruction, this court and all courts in Illinois say that the instruction should be given. And there was more than just some evidence. There was quite clear evidence that this had not been preserved, had in fact been destroyed, even though the police knew about it and they had done nothing to to try to rectify the situation, either by taking a photograph or by, you know, doing something else once the detective had been informed or any of the other things they could have done to preserve this. And I may, I've been doing this a long time and I may be unduly suspicious, but it seems odd that at the very minimum, there was no still picture. Let me just put it like that. And the jury instruction that should be given, if there's some evidence to support it, is reviewed, as I understand it, as a question of a abuse of discretion. And under these circumstances, given that the judge misunderstood what the previous judge Coughlin had ruled, that there was in fact some evidence and that the jury should have been so informed that it was a, was reversible error. And the state argued in their case that this was in fact the car that was taken. And they argued that somebody is caught on surveillance camera with a giant tattoo on their face, colored pants getting out of the car. That's an argument and rebuttal that was made at page 1366. They relied on and used this testimony as proof to bolster the identification that was made at trial by the two complaining witnesses. And in order to be able to effectively argue against it, the court should have given the jury instruction that the failure to preserve it could be held against the prosecution. Does anyone have any questions about that particular argument? Or I'll move on. Any questions? Okay, I just want to give you the opportunity and then then I'd like to turn my attention, given the time constraints here to the first argument regarding prosecutorial misconduct. And one of the things I want to say in the beginning is that I don't know quite how to say this politely, but I want to be clear that Mr. Jones and his counsel know what our duty of candor is to the court. And when we presented this argument, we were very upfront with you about the fact that some of it was preserved and some of it was not. And we addressed those legal concerns. And in the state's brief, there was a certain sort of gotcha thing, the way that it read, at least to me, that we were somehow not being upfront with the court. And I just want to reassure the court that we are aware and did, in fact, indicate any mistakes that we made or anything that was not properly preserved, we discussed that and we wouldn't do anything else that would be just improper. But I think it's important to think about the opening and the closing here and the clear invocation of sympathy and prejudice that was gotten, that was sought by the prosecutor, was highly prejudicial in the context of all the many other issues that exist in the case. And part of that is that they began by essentially saying, Julius Jones is a bad person. He's a taker. And the state's argument in response that that was just saying that he took something, that they were going to prove that he took something, is really inapposite in our view. And the reason that it's inapposite is that the argument could have been made or the statement could have been made that we will show you that Julius Jones took items from the two complaining witnesses as well as their car. It did not require a character assassination that was repeated later in closing argument. And it all ties into the way that this case became a form of character assassination in the sense that they spent a lot of time talking about a sexual, alleged sexual groping that was not a charged crime. There was a juror who had been reassured by the judge that this was not, did not involve sexual assault. I think her name was Rodriguez and she sat on the jury and then she heard all this testimony. There's a lot of things that happened in the trial that make this prosecutorial misconduct far more egregious than just an overstatement or a response or someone arguing something intemperately at the last moment, particularly in opening statement. Opening statements are not supposed to be argumentative. One is not supposed to characterize the testimony, characterize the people, but rather to give a preview of what the case is about and what the prosecution and the defense that they shall choose to open intends to prove. And that's not what happened. What they did was to say that Julius Jones was a taker, unlike the complaining witnesses who were good people and who worked. And in closing argument, the same prosecutor explicitly invoked sympathy again and suggesting that Jones was a career taker. And she characterized him as a sex offender, which was very inappropriate. And I'm not going to try to argue all of the other crimes evidence that came in. That's part of other arguments, unless you have questions about it, because I'm paying attention to time here. But their comment did come in response in rebuttal to an argument that was made properly by the defense in response to the many, many times that the groping and pregnancy of one of the complaining witnesses was discussed in the opening statement. I think it was five times, if I'm recalling correctly, and said properly that sympathy should not influence your verdict. That's an IPI instruction and that the evocation of sympathy was inappropriate. And in the argument, the Assistant State's Attorney McKay argued that Cheval's being pregnant should, in fact, make jurors sympathetic. You know what you heard, poking, don't turn around, don't turn around. What is he saying? Don't turn around when he's groping Jessica's eight month pregnant body. And no, the fact that she is eight months pregnant makes her more sympathetic and makes him well, I'm not going to finish that sentence. There's an objection and it's overruled, which compounds the problem. I feel that there is one other issue that I should address and then whatever question. I think we're going to cut you short. I'm sorry, say again. I think we're going to cut you short. Okay, I'll stop. Any questions? None for me. Aurelia, none? No, thank you. All right, Aretha, I guess you may proceed. May it please the court and counsel, Aretha Stotts from the State's Attorney for the People. Starting with the jury instruction issue. The idea that this was about preservation of evidence is wrong because that's not what the instruction said. It's talked about evidence that was under state control and that was a factual issue that was resolved against defendant in the trial court. He even appeared to concede in the trial court that the state never had this evidence. And the trial court specifically found that the state never had it and it was destroyed by a third party. So he's basically saying, you know, he's arguing that the police didn't work hard enough to build a case against him. But there is no rule that requires police to build a case against a defendant. And defendant was able to make this, you know, sloppy police work kind of argument in his closing. As for whether the judge misunderstood and thought this had already been ruled on by the prior judge, I don't think that's true. After the judge ruled, both parties, including the state, pointed out very clearly that this issue had been reserved. And then the court said, my ruling will stand. So the court was aware it was able to rule on this issue. And I would add, you know, whether this testimony about the video was coming in was really came down to a bad faith question. Because under Rule of Evidence 1004, if the recording is destroyed, you can introduce other evidence of its contents as long as there was no bad faith. And that issue was resolved against defendant and the trial court as well. The court specifically found no bad faith by the state here. And so that's why we got to put in that evidence. And defendant hasn't repealed that ruling either. A final point is that this instruction was based on civil IPI 5.01. And there are a lot of cases that suggest that that rule or that instruction isn't appropriate in criminal cases anyway, because it might be construed against the defendant. And moving to the prosecutor, the opening and closing, I certainly didn't mean to suggest that the defendant had misrepresented anything in his brief. And so I apologize to the court and counsel if my tone came off incorrectly. I just want to be clear about what was preserved. As for the opening, the prosecutor has wide latitude here. And these statements were not argumentative. They were factual. The statement about Saia being a worker was necessary context. That explained why he and Chabal were out and about at 2 a.m. She was picking him up from work. And as for whether defendant was a taker, that literally means a person who takes something. That was the crux of the case, that people had to prove that. And they did prove that he took things from the victims. So these statements were not about his character. They were about his actions. And the evidence did bear the statements out, and so they were appropriate. As for the closing comment about Chabal's pregnancy, defendant didn't say in closing that sympathy can't influence your verdict. He said something slightly different. He said the fact that Chabal was eight months pregnant, you can't allow that to make you feel sympathetic. He went a bit farther than the law goes. The law doesn't say that jurors can't feel bad for crime victims, especially pregnant ones. They can feel bad, and it would be impossible to ask them to not have emotions. All the law says is that they can't allow sympathy to affect their verdict. And so this was an invited response to defendant's, you know, incorrect comment that the jurors couldn't feel bad for this victim. And, you know, and, of course, none of this comes close to a due process violation. For all the reasons cited in Darden, you know, it doesn't mistake the evidence. The jury was instructed repeatedly that openings and closings weren't evidence, and they should disregard them if they weren't borne out. And then the evidence of defendant's guilt was overwhelming. The ID, the distinctive tattoo, the car in his parking lot, the evidence about the video of him getting out of the car, he's arrested with the gun. So there's no due process violation based on these statements. If I could just make two quick other points. There's a lot of some arguments about, you know, maybe the gun wouldn't have come in if the judge had known that only one victim supposedly identified it prior to trial as opposed to two. I think that's a bit of a distraction. This gun was coming in no matter what. All we had to do was prove that it was connected to the or that it was the type of weapon used in the offense, which it was, a black revolver. And then it was connected to the defendant, which it was because he discarded it. So whether one or two or zero victims specifically identified it was extra. We didn't need that. It was coming in because it was the type of weapon and connected to the defendant. And then once the gun was coming in, and I'd add a defendant waived the objection to the gun, we had to put in evidence about the chase because we had to tell the jury how the police came to possess the gun. Just a final point. There was some argument that the court might have misinterpreted one of the defendant's comments and allocution about not having regrets. I would point the court to defendant's comments at the hearing on his motion for reconsideration of sentence. And this is at page 54 of the report of proceedings. He makes clear that he is not remorseful because he didn't do it. He says, I maintain my innocence. I didn't do this crime. I can never show remorse for a crime I didn't do. So the court's interpretation of those comments was correct. And unless there are questions, I'd ask the court to affirm the judgment. Any questions? None from me. No. Okay. Andrea, you may close. Thank you. So I'm going to sort of go in reverse order and respond to the argument regarding the gun. In order to get the gun in, there was a proffer made by the prosecution that both people had identified it and that there was no report about it. And there was a lot of litigation regarding that so-called identification. It turned out that that representation was not correct. It was not true. One of the witnesses did not identify it. And the other one said that it was a revolver and he'd seen revolvers before because his grandfather had them in Mexico. Had the court known that, it is less likely that this would have been admitted at all. And the part about the chase went way past what it was supposed to be admitted for. Because the court had said this can only come in as to identification, not as to knowledge of guilt or flight as knowledge of guilt. So that's point one. In terms of the regarding the jury instruction. Actually, I would take issue with the state's position that an instruction that comes from the civil IPI can't be used in a criminal case. Of course it can if it's appropriate. And in the case of People v. Daniele, this court found the defendant was entitled on remand to an instruction to make an inference against the status of the contents of evidence that was lost by the state. Now, the fact that the state knew where it was and chose not to preserve it is the same thing as having lost it. You don't have to have had it and then destroyed it. That would allow, for example, someone to interview a witness, have the witness say that you have the wrong guy, not write it down and that would be fine. That can't possibly be what this court or other courts want to see. And it was really important that the jury had the opportunity to understand that the failure to follow up on this could mean an inference against the state. They weren't being told that they had to call it that way. They would be told by the judge that they could consider it that way. And, you know, Assistant State's Attorney Stotz's argument that the defense had an opportunity to talk about the sloppy investigation. Yes, that's correct. But as I said earlier, it is very different to hear what a defense lawyer has to say about an investigation and to hear from a judge that this is something that is properly considered. Finally, in closing, I know that the state has said that the evidence here is overwhelming, but it hardly is that. And it is difficult to talk about this case without talking about the elephant in the room, which is the face tattoos. First of all, in case you're wondering, I don't much like face tattoos. I don't understand them, but they are quite common, actually, I've learned. And it's important to note that the tattoos that were described differ from the tattoos that were on Mr. Jones. That is, the description was two, nothing about writing and nothing about a crown. And the ones on Mr. Jones were three with a crown and with writing. And I say that because it kind of comes down to an enormous opportunity for prejudice against the defendant because of what he chose to do to his face. For whatever reason, he decided to do that. And so when you're looking at the many errors we've talked about in our brief, please keep in mind that the fact that Julius Jones had face tattoos is not in and of itself proof that he is guilty. The evidence was contradicted. The evidence did not include any physical evidence that clearly made it clear that Mr. Jones had anything to do with this. And the fact that he said he was innocent doesn't mean that he did not acknowledge, as he did in allocution, that he'd taken wrong turns in his life and that he was trying to do better. So for all of those reasons, Your Honors, I would ask that you reverse this case for a new trial or, in the alternative, reduce the sentence, the really pretty outrageous sentence of 57 years, to a more reasonable one, or at least order a new sentencing hearing. Any questions? No questions. All right, thank you both. You made very good arguments and your briefs were well done. We'll let you know as soon as we discuss it.